555519

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

161
EX A-H

KSI CAPITAL CORP., a New Jersey
corporation,

Plaintiff,

v.

RICARDO PAGAN, an individual,

Defendant.

Case: 2:07-cv-12501
Assigned To: Battani, Marianne O
Referral Judge: Scheer, Donald A
Filed: 06-11-2007 At 04:59 PM
CMP KSI CAPITAL CORP V. PAGAN (TAM)

---

BARRIS, SOTT, DENN & DRIKER,
P.L.L.C.
Morley Witus (P30895)
James S. Fontichiaro (P35783)
Matthew J. Bredeweg (P67796)
Attorneys for Plaintiff
211 West Fort Street, 15th Floor
Detroit, Michigan  48226
(313) 965-9725

---

## COMPLAINT FOR BREACH OF GUARANTY

There is no other civil action between these parties arising out
of the same transaction or occurrence as alleged in this
complaint pending in this court, nor has any such action been
previously filed and dismissed or transferred after being
assigned to a judge.

## SUMMARY OF CLAIM

1.      Plaintiff KSI Capital Corp., ("KSI"), brings this suit to collect repayment from Defendant Ricardo Pagan, ("Pagan"), of a $4,000,000 defaulted loan (the "Loan"), made to Northeast Commercial Services Corporation d/b/a Northeast Business Realty Services, Inc., ("Northeast"), and secured by a mortgage on real property located at 1249 Washington Blvd in downtown Detroit, commonly known as the Book Tower, (the "Property").

2.      Northeast and Pagan have failed to make required payments under the Loan, damaged the Property, and interfered with KSI's rights over its collateral.

3.      On or about April 11, 2007, KSI informed Northeast and Pagan that they were in default of their obligations and demanded payment in full.

4.      To date, Pagan has failed to pay the $4,206,666.63 that is presently due and owing on the Loan, with additional sums reflecting interest, default interest, costs and attorneys' fees continuing to accrue.

## PARTIES

5.      KSI is a New Jersey Corporation, with its principal place of business in Paramus, New Jersey.

6.      Pagan is an individual residing in Brooklyn, New York.

## JURISDICTION AND VENUE

7.     Pursuant to 28 U.S.C. §1332(a), this Court has diversity jurisdiction over KSI's claims because the amount in controversy exceeds $75,000, exclusive of costs and interest, and the action is between citizens of different states.

8.     Pursuant to 28 U.S.C. §1391(a)(2), venue is proper in this Court because a substantial part of the events giving rise to this action occurred in the Eastern District of Michigan, and the mortgaged property is located in Detroit.

## STATEMENT OF FACTS

9.     On or about July 21, 2006, KSI extended a Loan to Northeast. The Loan was evidenced by a Loan and Security Agreement and a Promissory Note in the amount of $4,000,000. Ex. A ("Loan Agreement"); Ex. B (the "Note").

10.     As security for the Loan, Northeast executed and delivered to KSI, among other things a mortgage and assignment of leases. Ex. C (the "Mortgage"); Ex. D (the "Assignment of Leases").

11.     As further inducement for KSI to make the Loan, Pagan executed a guaranty dated July 21, 2006 ("Guaranty"). KSI would not have made the Loan without this security for payment. The Guaranty is attached and incorporated by reference. Ex. E.

12.     The Loan Agreement, Note, Mortgage, Assignment of Leases, and the Guaranty shall be collectively referred to as the "Loan Documents."

3

13.    By entering into the Guaranty, Pagan guaranteed "the full prompt and unconditional payment of [Northeast's] Debt, when and as the same shall become due, whether at the stated maturity date, by acceleration or otherwise . . ." Ex. E ¶ 2.

14.    Pagan further guaranteed the "full, prompt and unconditional performance of each and every term and condition of every transaction to be kept and performed by [Northeast] under the Note." *Id.*

15.    Among other events, the Note provides that a default under the Mortgage or any other agreement, document, or certificate in connection with the Loan constitutes a default under the Note. Ex. B at p. 3.

16.    Among other events, the Loan Agreement listed the following events as "Events of Default: "failure of [Northeast] to make any payment of any installment of principal or interest under the Note;" and "if there shall be filed by or with consent or authorization of [Northeast or Pagan] a petition in bankruptcy for liquidation or for reorganization." Ex. A ¶¶ 10(a), 10(p).

17.    The Guaranty is an absolute, continuing, unconditional and unlimited guaranty of payment and not merely of collection," and provides that Pagan's liability for Northeast's debt is independent of and separate from the liability of Northeast. Ex. E ¶ 2(d).

18.    Pagan also agreed to pay all of KSI's costs, including reasonable attorneys' fees incurred in connection with collecting on the Loan and Guaranty. *Id* ¶ 2(b).

4

19.     On July 21, 2006, KSI funded the full principal amount of the Loan of $4,000,000.00 in consideration of Pagan's Guaranty.

20.     The Note required Northeast to pay monthly interest payments on the first day of each month. Ex. B at p. 2.

21.     Northeast failed to make the required interest payments, and as a result, by letter dated April 11, 2007, KSI declared Northeast and Pagan in default under the Loan Documents and accelerated the full amount of the debt. Ex. F

22.     Pagan, despite his legal obligation to do so, has failed to make any payment to KSI.

23.     On or around April 11, 2007, KSI's representatives entered the Property to inspect its condition. To their surprise, they encountered workers who were ripping heavy gauge copper cable from the walls, thereby reducing the value of the Property. *See* Ex. G.

24.     Upon information and belief, the damage was done with the knowledge and/or consent of Northeast and Pagan and in violation of the terms of the Mortgage which states that Northeast "shall not demolish or remove or permit the demolition or removal of the Improvements or Accessories, or any part thereof, without the prior consent of Mortgagee in each instance." Ex. C at § 2.10(a).

25.     On or around April 12, 2007, KSI notified the tenants of the Property that KSI was exercising its Assignment of Leases, and that the tenants should make all future rent payments to plaintiffs. Ex. H.

27. Upon information and belief, Northeast and/or Pagan ordered at least some tenants to ignore the Assignment and to continue making rent payments to Northeast, in direct violation of the Loan Documents.

26. On May 23, 2007, Northeast filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 07-50166 - PJS. Such filing constitutes a default under the Loan Documents.

27. As of June 11, 2007, there remains $4,206,666.63 outstanding on the Note. Pagan currently owes KSI this amount, plus interest which accrues at a per diem rate of $1,333.33, attorneys' fees, and any other costs incurred in connection with this action through the date of payment under the terms of the Loan Documents, or applicable law.

## BREACH OF GUARANTY BY PAGAN

28. KSI incorporates each preceding paragraph as if specifically realleged herein.

29. The Guaranty was supported by good and valuable consideration.

30. KSI has fulfilled all of its obligations under the terms of the Guaranty.

31. Northeast and Pagan have each defaulted on their payment obligations under the Loan Documents.

32. Northeast and Pagan have further defaulted on their obligations under the Loan Documents by permitting the copper wire to be ripped from the walls of the Property.

6

33.     Northeast and Pagan have further defaulted on their obligations under the Loan Documents by interfering with KSI's exercise of the Assignment of Leases.

34.     Northeast and Pagan have further defaulted on their obligations under the Loan Documents by Northeast filing a voluntary bankruptcy petition.

35.     On April 11, 2007, KSI accelerated the balance due on the Note and demanded payment of all amounts due under the Guaranty.  Ex. F.

36.     To date, KSI has not received full payment of all amounts owing under the Guaranty from the Pagan.

37.     As a result of Pagan's breaches of the Guaranty, as of June 11, 2007, KSI is entitled to $4,206,666.63 in damages against Pagan, plus interest which continues to accrue at a per diem rate of $1,333.33, attorneys' fees, and any other costs incurred in connection with this action.

**WHEREFORE**, KSI respectfully requests that this Court enter a judgment against Pagan and in favor of KSI:

A.     Awarding damages in an amount of $4,206,666.63, plus interest which continues to accrue at a per diem rate of $1,333.33, costs, expenses and attorneys fees in this matter plus interest and all other sums payable under the terms of the Loan Documents;

B.     Awarding damages in an amount to be proven at trial resulting from the damage to KSI's collateral in violation of the Loan Documents;

C.     Awarding damages in an amount to be proven at trial resulting from the interference of KSI's exercise of the Assignment of Rents;

B.     Granting any and all further relief as the Court may deem to be fair, just, or equitable.

Respectfully Submitted,

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By: _____

Morley Witus (P30895)
James S. Fontichiaro (P35783)
Matthew J. Bredeweg (P67796)
Attorneys for Plaintiff
211 West Fort Street, 15th Floor
Detroit, Michigan 48226
(313) 965-9725

Dated:      June 11, 2007

f:\docsopen\mbredeweg\l-cmp\0338108.03

8

## Index of Exhibits

A      Loan And Security Agreement

B      Note

C      Mortgage

D      Assignment of Leases

E      Guaranty

F      Acceleration Letter

G      Photographs of Damage

H      Letter Exercising Assignment of Leases

f:\docsopen\mbredeweg\I-ind\0338866.01



# LOAN AND SECURITY AGREEMENT

Between

## NORTHEAST COMMERCIAL SERVICES CORPORATION
a New York Corporation
as Borrower,

AND

## KSI CAPITAL CORP.
as Lender,

Date:  as of July 21 , 2006

#2773471 (145427.013)

# TABLE OF CONTENTS

**Page**

1.  Definitions ........................................................................................................... 1
2.  The Loan. ............................................................................................................ 3
3.  The Note ............................................................................................................. 5
4.  Grant of Security Interest. ................................................................................ 5
5.  Conditions Precedent to Lender's Obligations ............................................... 7
6.  Representations and Warranties of Borrower .................................................. 9
7.  Survival of Representations and Warranties .................................................. 13
8.  Affirmative Covenants ...................................................................................... 14
9.  Negative Covenants of Borrower ..................................................................... 17
10. Events of Default ............................................................................................... 19
11. Remedies. ............................................................................................................ 21
12. Payment of Expenses. ....................................................................................... 22
13. Lender's Right to Assign .................................................................................. 23
14. Default Interest Rate ......................................................................................... 23
15. Usury Savings .................................................................................................... 23
16. Notices ................................................................................................................ 23
17. No Waiver .......................................................................................................... 24
18. Failure to Exercise Rights ................................................................................ 24
19. Prohibition Against Exercise of Rights Applicable Only to Individual
    Lenders ............................................................................................................... 25
20. Miscellaneous. ................................................................................................... 25
21. Successors and Assigns. .................................................................................... 27
22. Waiver of Jury Trial .......................................................................................... 27
23. Releases of Collateral ........................................................................................ 28

## Schedules

Schedule A  - Description of the Collateral
Schedule B  - Principal Loan Documents
Schedule C  - Permitted Encumbrances
Schedule D  - Lenders

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** ("Agreement"), dated as of July _01_, 2006, between **NORTHEAST COMMERCIAL SERVICES CORPORATION**, a New York corporation, (transacting business in the State of Michigan under the name of Northeast Business Realty Services, Inc.), having an address at 77 Woodbine Street, Brooklyn, New York 11221 ("Borrower"), and **KSI CAPITAL CORP.**, a New Jersey corporation having an address at 17 Arcadian Avenue, Suite 106, Paramus, New Jersey 07652 ("KSI") as lender and as agent for the lenders identified on Schedule D attached hereto and incorporated herein by reference, in each case having an address care of KSI Capital Corp., 17 Arcadian Avenue, Suite 106, Paramus, New Jersey 07652 (KSI and the lenders identified on Schedule D are hereinafter collectively referred to as "Lender").

## W I T N E S S E T H

**WHEREAS**, Borrower has requested that Lender make a loan to Borrower in the amount of **FOUR MILLION and 00/100 ($4,000,000) DOLLARS** (the "Loan"), subject to and upon the terms and conditions hereinafter contained, which Loan shall be evidenced by a Promissory Note as of even date herewith from Borrower to Lender (the "Note");

**WHEREAS**, the Loan is to be secured by certain instruments, agreements and documents, including, but not limited to, those items identified in the Principal Loan Documents as set forth on Schedule B hereto and made a part hereof, and payment and performance of the Loan is to be guaranteed pursuant to that certain guaranty of even date herewith from Guarantor (as hereinafter defined) to Lender ("Guaranty");

**WHEREAS**, capitalized terms not otherwise defined herein shall have those meanings assigned to them in the Loan Documents (as hereinafter defined); and

**WHEREAS**, Lender has agreed to make the Loan to Borrower on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and of the covenants and conditions hereinafter set forth, Borrower and Lender hereby agree as follows:

1. **Definitions.** As used herein:

(a) "Account" or "Accounts Receivable" means, in addition to the definition of account as contained in the Uniform Commercial Code, the right of Borrower to receive payment for goods sold or leased or for services rendered which are not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

(b)　"Account Debtor" means, in addition to the definition of account debtor as contained in the Uniform Commercial Code, the person or persons obligated to Borrower on an Account, or who is represented by Borrower to be so obligated.

(c)　"Affiliate" of any Person (as hereinafter defined) shall mean any other Person which, directly or indirectly, controls or is controlled by, or is under common control with such Person. For the purposes of this definition, "controls" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(d)　"Business Day" shall mean any day upon which banks located in the State of New Jersey generally are open to conduct regular banking business.

(e)　"Closing Date" shall mean the date on which this Agreement is executed by the parties hereto and the conditions set forth in Paragraph 5 are fulfilled to the satisfaction of Lender.

(f)　the "Collateral" shall mean the Real Property Collateral, the Collateral described in Paragraph 4 hereof, any other collateral described in any Loan Document and any other property of Borrower and/or Guarantor now or hereafter subject to a security agreement, mortgage, pledge, assignment or other document granting Lender a security interest therein and/or securing the Loan.

(g)　the "Default Rate" shall have the meaning ascribed thereto in the Note.

(h)　"Dollar" or "$" or "dollar" or any other terms of similar import shall mean United States Dollars, it being understood and agreed that all advances of the Loan shall be made in U.S. Dollars and repaid or reimbursed in U.S. Dollars without reduction for currency exchange fluctuation.

(i)　"Environmental Laws" shall mean a collective reference when and as applicable to (i) the Comprehensive Environmental Response, Compensation & Liability Act, as amended, 42 U.S.C. Section 9601 et seq., (ii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., and (iii) any and all other federal, state and local statutes, laws, rules, ordinances, regulations and executive orders pertaining to environmental matters applicable to the Borrower's business and/or properties, as the same may be amended or supplemented from time to time.

(j)　"Governmental Authority" or "Governmental Authorities" shall mean any federal, state, county or municipal governmental agency, board, commission,

officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over Borrower, the Guarantor (as hereinafter defined) or the Collateral.

      (k)   the "Guarantor" shall mean Ricardo C. Pagan.

      (l)   the "Indemnified Party" and "Indemnified Parties" shall mean Lender as well as their directors, officers, trustees, partners, employees, agents, attorneys and shareholders.

      (m)   the "Loan Documents" shall mean this Agreement, the Note, the Mortgage (as hereinafter defined), the Guaranty and any other documents or agreements given to Lender by Borrower or the Guarantor in connection with the Loan whether or not specifically set forth herein.

      (n)   "Mortgage" shall mean that certain mortgage and security agreement, given by Borrower (as such term is defined therein), as mortgagor, in favor of Lender, as mortgagee, in connection with the Mortgaged Property, which Mortgage is given as security for the due payment of Borrower's obligations under the Note.

      (o)   "Person" or "Persons" shall mean any one or more individuals, partnerships, corporations (including a business trust), joint stock companies, limited liability company, trusts, unincorporated associations, joint ventures or other entities, or a foreign state or political subdivision thereof or any agency of such state or subdivision.

      (p)   "Personalty" shall mean all Accounts, Accounts Receivable, Equipment, Inventory, Goods and other personal property of the Borrower, as more particularly described herein.

      (q)   "Real Property Collateral" or "Mortgaged Property" shall mean that certain real property owned or leased by Borrower, situated in Detroit, Michigan as more particularly described in Schedule A attached hereto and made a part hereof.

      (r)   "Uniform Commercial Code" shall mean the Uniform Commercial Code, as enacted in the State of Michigan and amended from time to time.

2.   **The Loan.**

      (a)   Provided that no default shall have occurred and be continuing hereunder, Lender agrees, subject to the terms and conditions hereinafter set forth, to advance to Borrower up to FOUR MILLION and 00/100 ($4,000,000) DOLLARS.

      (b)   Subject to a final closing statement prepared by Lender's counsel and executed by Borrower (the "Closing Statement"), the Loan proceeds shall be disbursed as follows and used only for the following purposes:

(1)     The sum of Four Hundred Thousand and 00/100 ($400,000.00) Dollars shall be disbursed on behalf of Borrower on the Closing Date and simultaneously paid to Lender as a fully earned, non-refundable fee (the "Transaction Fee") in consideration of Lender's commitment to make the Loan on the terms and conditions stated herein.  In no event shall the Transaction Fee be applied or credited in reduction of any principal, interest or other sum payable hereunder; and

(2)     Intentionally Omitted.

(3)     Intentionally Omitted.

(4)     The sum of Eighty Six  ($86,000.00) Dollars  shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender as the balance of the commitment fee ("Commitment Fee") due to Lender pursuant to the loan commitment letter entered into by and between Borrower and Lender, dated July 6, 2006;

(5)     The sum of EIGHT THOUSAND FIVE HUNDRED DOLLARS and 00/100 ($8,500.00) Dollars shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Wilentz, Goldman & Spitzer, PA in payment of its legal fees;

(6)     The sum of TWO THOUSAND ONE HUNDRED FIFTY EIGHT and 00/100 ($2,158.00) Dollars shall be disbursed by Lender on behalf of Borrower on behalf  of the Closing Date and simultaneously paid to Barris, Scott, Denn & Driker, PLLC  in payment of its legal fees; and

(7)     The balance of the loan proceeds shall be disbursed to Borrower, Borrower's legal counsel or the title company insuring the Mortgage executed by Borrower in favor of Lender.

(c)     The foregoing disbursements may be made, notwithstanding contrary directions from Borrower , and for such purpose Borrower agrees that:

A.     The foregoing constitutes an irrevocable direction or authorization to so disburse the funds (said authorization being coupled with an interest) and no further direction or authorization from Borrower shall be necessary to warrant any such disbursements; and

B.     All such disbursements shall satisfy the obligations of Lender to advance funds to Borrower notwithstanding any other agreement or document to the contrary and shall be secured by the Mortgage as fully as if made by Borrower, regardless of the disposition by the party to whom such disbursements are so made.

3.    **The Note.**  The obligation of the Borrower to repay all monies advanced by Lender to Borrower in connection with the Loan shall be evidenced by this Agreement and the Note.  The Loan shall bear interest at the rate(s) set forth in the Note and shall be payable as provided in the Note with final payment due on August 1, 2009.  All of Borrower's obligations hereunder and under the Note are secured by the Mortgage and the other Loan Documents.  Should the principal of or interest on the Loan become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate per annum specified in the Note during such extension.

4.    **Grant of Security Interest.**

(a)    Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in all Accounts, as defined herein, presently owned by Borrower or hereafter acquired to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property.

(b)    Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in all of Borrower's Equipment, as such term is defined in the Uniform Commercial Code, and in all of Borrower's  machinery and equipment of every kind, nature and description, as well as trucks and vehicles of every kind and description, including, but not limited to, trailers, cranes and hoisting equipment, whether presently owned by Borrower or hereafter acquired, and wherever located to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property.

(c)    Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in all of Borrower's Inventory, as defined in the Uniform Commercial Code, whether presently owned by Borrower or hereafter acquired and wherever located to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property.

(d)    Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in all of Borrower's General Intangibles, as defined in the Uniform Commercial Code, whether presently owned by Borrower or hereafter acquired to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property.

(e)    Borrower hereby creates in favor of Lender, hereby assigns to Lender and hereby grants to Lender a security interest in the balance of every deposit account, now or hereafter existing, of Borrower with Lender, and all money, instruments, securities, documents, chattel paper, credits, claims, performance bonds, payment bonds, all other forms of surety to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, and other property of Borrower now or hereafter in the possession or custody of Lender.

(f)     Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in all of Borrower's Chattel Paper, as defined in the Uniform Commercial Code, whether presently owned by Borrower or hereafter acquired, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Chattel Paper now or hereafter left in the possession of Lender for any purpose.

(g)     Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in all of Borrower's Instruments, as defined in the Uniform Commercial Code and also including a negotiable instrument or a security, or any other writing which evidences a right to the payment of money and is of the type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment whether presently owned by Borrower or hereafter acquired, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Instruments now or hereafter left in the possession of Lender for any purpose.

(h)     Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in all of Borrower's Documents, as defined in the Uniform Commercial Code, whether presently owned by Borrower or hereafter acquired, including but not limited to all such Documents now or hereafter left in the possession of Lender for any purpose.

(i)     Borrower hereby creates in favor of Lender and hereby grants to Lender a security interest in (A) all books and records, including, without limitation, customer lists, credit files, computer programs, print-outs and other computer materials and records of Borrower pertaining to all of the Collateral; and (B) all of the products and proceeds of all of the foregoing Collateral (including all proceeds of insurance policies covering the Collateral); as well as all accessions, additions, substitutions, replacements and increments as to the assets in (A) and (B).

(j)     Borrower hereby creates in favor of Lender, and hereby grants to Lender a security interest in all of Borrower's Goods, as defined in the Uniform Commercial Code, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property whether presently owned by Borrower or hereafter acquired.

(k)     Borrower will perform any and all steps requested by Lender to create and maintain in Lender's favor a first and valid lien on and security interest in the Collateral or pledges of Collateral, including, without limitation, the execution, delivery, filing and recording of financing statements and continuation statements, supplemental security agreements, notes, filings with federal government offices and any other documents necessary, in the opinion of Lender, to protect its interest in the Collateral which liens shall be exclusive except for those liens expressly permitted elsewhere

herein.  Lender and its designated officer are hereby appointed Borrower's attorney-in-fact to do all acts and things which Lender may deem necessary to perfect and continue perfected the security interests and Liens provided for in this Agreement, including, but not limited to, executing financing statements on behalf of Borrower.

5.    **Conditions Precedent to Lender's Obligations.**  Lender shall not be obligated to make the Loan hereunder unless Lender shall have received the following prior to the disbursement of any loan proceeds, all in form and substance satisfactory to the Lender in all respects:

(a)    the Note, duly executed by Borrower;

(b)    the Mortgage, duly executed by Borrower;

(c)    this Agreement, duly executed by Borrower;

(d)    the Guaranty, duly executed by Guarantor;

(e)    the Assignment of Leases and Rents, duly executed by Borrower;

(f)    the Assignment of Licenses, Contracts, Plans, etc., duly executed by Borrower;

(g)    the Environmental Indemnity Agreement, duly executed by Borrower and Guarantor;

(h)    the Document Re-Execution Agreement, duly executed by Borrower and Guarantor;

(i)    the Closing Statement, duly executed by Borrower;

(j)    certificates of insurers, or other evidence satisfactory to Lender, indicating that Borrower and Guarantor have obtained the policies of insurance as are required under the terms of the Mortgage;

(k)    a paid title insurance policy (without survey exception) in the full amount of the Loan issued by a title insurance company acceptable to Lender and insuring the Mortgage as a valid first lien on the Mortgaged Property, with such endorsements as Lender shall require and subject to the Permitted Exceptions identified in the Mortgage;

(l)    UCC-1 financing statements required to evidence or perfect Lender's security interest in the personal property now or hereafter owned by the Borrower and located on or used in connection with the Mortgaged Property and UCC-1 financing statements required to perfect Lender's security interest in the Collateral;

(m)     an appraisal of the Mortgaged Property;

(n)     financial statements and tax returns for Borrower, and the Guarantor;

(o)     evidence of a search of the public records which discloses no conditional sales contracts, chattel mortgages, leases of personalty, financing statements or title retention agreements filed or recorded against the Borrower or the Mortgaged Property;

(p)     a survey of the Mortgaged Property prepared in accordance with the "Minimum Standard Detail Requirements for ALTA and ACSM Land Title Surveys" jointly established by ALTA and ACSM in 1999 and certified to Lender by a registered land surveyor acceptable to the Lender ("Survey") shall be delivered to Lender within thirty (30) days of the date hereof;

(q)     copies of all permits or approvals required by Governmental Authorities to such date with respect to Borrower or the Mortgaged Property, to the extent the same are necessary and appropriate to operate and develop the Mortgaged Property.

(r)     an environmental audit of the Mortgaged Property (Phase I and, if necessary Phase II);

(s)     the operating agreement of Borrower certified by the Manager of Borrower;

(t)     an incumbency certificate of Borrower which shall certify the names and titles of the officers of the corporation authorized to sign, in the name and on behalf of Borrower this Agreement and each other Loan Document to be delivered pursuant to this Agreement by Borrower, together with the true signatures of such officers, upon which certificate the Lender may conclusively rely;

(u)     corporate resolution of the corporation authorizing the transactions to be entered into by Borrower in connection with this Agreement;

(v)     evidence that the Mortgaged Property is not located in a federal or state flood hazard area;

(w)     certification regarding debts and liens, executed by the owner of the Mortgaged Property;

(x)     payment of the Short Interest, the Transaction Fee and the Commitment Fee; (as such terms are defined herein and in the Note) and other fees and expenses required to be paid to or on behalf of Lender in connection with the Loan;

(y)     opinions of legal counsel to the Borrower with respect to such matters as the Lender may reasonably request including, but not limited to, opinions from Borrower's local Michigan and New York counsel;

(z)     an opinion of legal counsel to the Guarantor with respect to such matters as the Lender may reasonably request including, but not limited to, opinions from Guarantor's local Michigan and New York counsel; and

(aa)     evidence of the appointment of an agent to accept service of process on behalf of the Borrower and Guarantor, pursuant to the requirements of the Loan Documents;

(bb)     evidence demonstrating current full compliance with all applicable zoning, health, environmental and safety laws, ordinances and regulations (including, without limitation, approval of local, private or public sewage or water utility);

(cc)     certification from Borrower that Borrower is not a party to any existing or pending or threatened litigation, except as previously disclosed to Lender; and

(dd)     evidence demonstrating receipt of all appropriate approvals meeting all applicable requirements of all Governmental Authorities having jurisdiction including, but not limited to, subdivision and site plan approvals, potable water supply, sewage discharge and sewage connection, use of septic tanks or alternatives.

(ee)     satisfactory evidence that all roads and utilities necessary for the full utilization of the Collateral for its intended purposes have been completed or the presently installed and proposed roads and utilities will be sufficient for the full utilization of Collateral for its intended purposes.

(ff)     such other agreements, certificates or other documents as Lender or Title Insurance Company may reasonably request;

6.     **Representations and Warranties of Borrower.**  To induce Lender to make the Loan pursuant to this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)     Borrower is a corporation, duly organized under the laws of the State of New York, and has all requisite power and authority and legal right to own its property, to carry on its business as it is now being conducted, to enter into this Agreement and the other Loan Documents entered into by it and to perform all of its obligations hereunder and thereunder.

(b)     The execution and delivery by Borrower of the Loan Documents, and the performance of its obligations thereunder, have been duly authorized by all necessary action, corporate or otherwise, and do not and will not: (i) require any further

action, consent or approval on the part of the members of Borrower; (ii) violate any provision of law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower, or the members of Borrower; or (iii) result in any breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which the Borrower or its properties may be bound or affected, and the Borrower is not in default under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, agreement, lease or instrument.

(c)     The Loan Documents have been duly executed and delivered by Borrower in New Jersey and are legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

(d)     Except as previously disclosed to Lender, there is no material action, suit, proceeding, inquiry or investigation, at law or in equity, or before any court, governmental instrumentality, public board or arbitrator pending or threatened against or affecting Borrower or any of its properties or rights, wherein an unfavorable decision, ruling or finding would (i) to the extent not covered by insurance as to which the insurer has not disclaimed coverage, result in any material adverse change in the financial condition, business, properties or operations of Borrower; (ii) materially or adversely effect the transactions evidenced by the Loan Documents; (iii) materially impair the right of either to carry on its business substantially as now conducted; or (iv) adversely effect the validity or enforceability of the Loan Documents.

(e)     To the best of Borrower's knowledge, Borrower is in compliance with all laws applicable to Borrower or its properties or assets.

(f)     Borrower is a pre-existing corporation/limited liability company and is actively engaged in the operation of its business and has not been created as a vehicle to obtain the Loan. The proceeds of the Loan will be used by Borrower for the purposes set forth in Paragraph 6(n) in connection with the operation of Borrower's business, and the proceeds of the Loan will not be paid over or diverted by Borrower to any member, manager, officer, director, trustee, shareholder of Borrower, any Guarantor or any other person.

(g)     The following persons constitute the members of Borrower:

Ricardo C. Pagan, President

(h)   There has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of its financial statements furnished to Lender.

(i)   Borrower's properties and assets reflected on its financial statements referred to above, and all such properties and assets are free and clear of all mortgages, pledges, liens, charges or other encumbrances, except as reflected on such financial statements.

(j)   Borrower and the Guarantor have each filed all federal, state and other income or franchise tax returns which are required to be filed and have paid all taxes due or which may become due pursuant to such returns or pursuant to any assessment received by it.

(k)   All timely authorizations, permits, approvals and consents of Governmental Authorities which may be required in connection with the valid execution and delivery of this Agreement and the other Loan Documents and the carrying out or performance of any of the activities or transactions required or contemplated hereunder or thereunder have been obtained (and remain in full force and effect).

(l)   All financial statements, information and other financial data furnished by Borrower and the Guarantor to Lender in connection with the Agreement (i) were true, correct and complete in all material respects, as of the date of said financial statements, information and other data, (ii) such financial statements present fairly the financial condition of Borrower and the Guarantor at the respective dates thereof and the results of operations and changes in financial position for the periods to which they apply, and (iii) there have been no material adverse changes in the financial condition of Borrower or any Guarantor since the delivery by Borrower or the Guarantor, as the case may be, to Lender of the most recent financial statements.

(m)   Borrower's assets, at a fair valuation, exceed Borrower's liabilities (including, without limitation, contingent liabilities). Borrower is paying its debts as they become due and Borrower anticipates the continuing ability to pay its debts as they become due. Borrower has capital and assets sufficient to carry on its business.

(n)   Proceeds from the Loan shall be used only as set forth in this Agreement, the Closing Statement, and for other proper corporate/limited liability company purposes. No part of the proceeds of the Loan shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of Regulation U of the Board of Governors of the Federal Reserve System. In particular, without limitation of the foregoing, no part of the proceeds from the Loan are intended to be used to acquire any publicly-held stock of any

kind. As used in this subparagraph (n), the terms "margin stock" and "purpose of purchasing or carrying" shall have the meanings assigned to them in the aforesaid Regulation U, and the term "publicly-held," in respect to securities, shall have the meaning assigned to it in Section 220.7(a) of Regulation T of the Board of Governors of the Federal Reserve System.

(o)     Borrower is not in violation of or in default under (nor on the Closing Date is there any waiver in effect which, if not in effect, would result in a violation or default under) any provision of Borrower's bylaws/operating agreement, or under any provision of any agreement, indenture, evidence of indebtedness, loan or financing agreement, certificate, lease or other instrument to which it is a party, or by which it is bound, or of any law, governmental order, rule or regulation, in any such case under this subparagraph (o) so as to affect adversely in any material manner its business, assets or financial conditions.

(p)     All statements, representations and warranties made by Borrower or any other person in this Agreement, any other Loan Document and any other agreement, document, certificate or instrument previously furnished or to be furnished by said person to Lender under this Agreement or in connection with the Loan: (i) are and shall be true, correct and complete in all material respects at the time they were made and, in the case of those made prior to the Closing Date, on and as of the Closing Date, (ii) do not and shall not contain any untrue statement of a material fact at the time made, and (iii) do not and shall not omit to state a material fact at the time made necessary in order to make the information contained herein or therein not misleading or incomplete. Borrower understands that all such statements, representations and warranties shall be deemed to have been relied upon by Lender as a material inducement to provide the Loan.

(q)     No person is entitled to receive from Borrower any brokerage commission, finder's fee or similar fee or payment in connection with the consummation of the transactions contemplated by this Agreement. No brokerage or other fee, commission or compensation is to be paid by Lender by reason of any act, alleged act or omission of Borrower with respect to the transaction contemplated hereby.

(r)     Borrower has no knowledge of any of the following:

(i)     The release or threatened release of any hazardous substance, pollutant or contaminant as each such term is presently defined in any applicable Environmental Laws resulting from any activity by or on behalf of Borrower or any predecessor in interest to the Mortgaged Property, including, without limitation, the generation, handling, storage, treatment, transportation or disposal of any hazardous substance, pollutant or contaminant at any of the past or present business locations and facilities of Borrower; or

(ii)    Any past or future action taken or to be taken by any federal, state, county or municipal Governmental Authority or by any other person under any applicable Environmental Laws concerning the release of any hazardous substance, pollutant or contaminant into the soil, air, surface or subsurface water or the environment in general from any of the past or present business locations and facilities of Borrower; or

(iii)    Any claims or actions brought or which are threatened to be brought by any Person against Borrower for damages occurring at or outside of any of the past or present business locations and facilities of Borrower resulting from the alleged release or threatened release of any hazardous substance, pollutant or contaminant by Borrower or any predecessor in interest, including, without limitation, claims for health effects to Persons, property damage and/or damage to natural resources.

(s)    (A)    Borrower's address set forth above is the location of Borrower's chief executive office, and is the only location where Borrower keeps its records concerning its Accounts, and its inventory and equipment. (B) Within four (4) months of the date of this Agreement, none of Borrower's assets have been moved from any jurisdiction or other locations than the present location of assets set forth above except for inventory or equipment purchased or sold by Borrower in the ordinary course of business from persons or entities customarily selling such inventory or equipment. (C) As of the date hereof no inventory is now stored with a bailee, warehouseman or similar party. (D) As of the date of this Agreement, Borrower does not hold any goods belonging to third parties or in which other parties have an interest, including any goods sold on a bill and hold basis. (E) Borrower does not presently purchase or otherwise hold goods on a consignment basis. (F) None of Borrower's inventory is of a nature that contains any labels, trademarks, trade names, or other identifying characteristics which are the properties of third parties, and the use of which by Borrower is in violation of the rights of such third parties or under license, royalty or similar agreements with any third parties. (G) No persons hold any goods of Borrower. (H) Borrower has not purchased any inventory or equipment except in the ordinary course of business for value and from persons customarily in the business of selling such inventory or equipment. (I) Borrower does not hold any instrument or chattel paper connected with any Account. (J) Borrower does not own any trademarks, trade names, patents or copyrights. (K) No surety bonds have been issued on behalf of Borrower with respect to any contracts or purchase orders out of which Accounts Receivable have arisen or are expected to arise.

(t)    Borrower is the owner and the operator of the Mortgaged Property.

7.    **Survival of Representations and Warranties.** The foregoing representations and warranties shall survive the execution of this Loan Agreement and the closing of the Loan.

8.    **Affirmative Covenants.**  To induce Lender to make the Loan pursuant to this Agreement, Borrower hereby covenants and agrees that so long as the Loan shall remain outstanding hereunder, Borrower shall comply with the following covenants:

(a)    Borrower shall keep and maintain complete and accurate books, accounts and records.  Borrower shall permit access thereto and examination thereof by Lender and any authorized representatives of Lender, at all reasonable times and places during normal business hours (including the right to make copies thereof at the cost and expense of Borrower).

(b)    Borrower shall comply in all material respects with all applicable federal, state, county and municipal laws, rules, regulations and orders of any Governmental Authority having jurisdiction over Borrower, subject to the limitations expressly set forth in the Mortgage, except to the extent contested in good faith and by proper proceedings or where the failure to so comply would not have a material adverse effect on Borrower, including, without limitation, all Environmental Laws and health and safety laws.

(c)    Borrower shall promptly notify Lender of the occurrence of any Event of Default or an event which, with the giving of notice or passage of time or both, would constitute an Event of Default and of the occurrence of any event or the commencement of any action, suit or proceeding which, if adversely determined, would adversely affect the condition, financial or otherwise, of Borrower or Guarantor.

(d)    Borrower shall indemnify, protect, defend and save harmless the Indemnified Parties from and against (i) any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims, or demands, by third parties including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loan and the transactions contemplated herein, and (ii) any and all losses, damages, expenses or liabilities sustained by Lender in connection with any environmental sampling or cleanup relating to any properties or assets owned or otherwise used by Borrower in the operation of its business, or mandated by any Environmental Law; provided, however, Borrower shall not be obligated to indemnify, protect, defend and save harmless an Indemnified Party, if the loss, damage, expense or liability was caused by or resulted from the gross negligence or willful misconduct of that Indemnified Party.  In case any action shall be brought against an Indemnified Party based upon any of the above and in respect to which indemnity may be sought against Borrower, the Indemnified Party against whom such action was brought, shall promptly notify Borrower in writing, and Borrower shall assume the defense thereof, including the employment of counsel selected by Borrower and reasonably satisfactory to the Indemnified Party, the payment of all costs and expenses and the right to negotiate and consent to settlement.  Upon reasonable determination made by the Indemnified Party, the Indemnified Party shall have the right to employ separate counsel in any such action

and to participate in the defense thereof at the Indemnified Party's cost and expense. Borrower shall not be liable for any settlement of any such action effected without its consent, but if settled with Borrower's consent, or if there be a final judgment for the claimant in any such action, Borrower agrees to indemnify and save harmless said Indemnified Party against whom such action was brought from and against any loss or liability by reason of such settlement or judgment. The provisions of this subparagraph (d) shall survive the termination of this Agreement and the final repayment of the Loan.

(e)     If Lender shall so require, Borrower agrees to establish and maintain at a banking institution of Lender's choice a lockbox, in accordance with Lender's standard lockbox agreement in effect from time to time, and to direct all Account Debtors to make remittances on all Accounts to said lockbox. Any and all remittances received in said lockbox may be applied to the Obligations of Borrower to Lender in accordance with Paragraph (g) hereof.

(f)     If, notwithstanding the notices to Account Debtors to remit payments on Accounts to the lockbox referred to above, Borrower receives any payments on Accounts or other Collateral, Borrower agrees to receive any and all payments and remittances on Accounts and Inventory and other Collateral, including cash, checks, drafts, notes, acceptances or other forms of payment in trust for Lender and to deliver such payments in the identical form in which they were received, together with collection reports in form satisfactory to Lender.

(g)     All proceeds of any Account(s) and inventory and other Collateral which are delivered to or otherwise received by Lender for application to the Loan provided for herein shall be deemed received as of the date of actual receipt by Lender, and shall be applied by Lender on account of the Obligations upon Lender's receipt of same; provided, however, that no checks, drafts, or other Instruments received by Lender shall constitute payment to Lender unless and until such item of payment has actually been collected by Lender. For the sole purpose of calculation of interest due to Lender from Borrower, all such proceeds and other payments on account of the Loan provided for in this Agreement, irrespective of the type or form of payment thereof shall not be considered applied on account of the Obligations until actual clearance of such funds.

(h)     Borrower shall maintain all of its property in good working condition, ordinary wear and tear excepted (including obsolete and abandoned property).

(i)     Borrower shall, within ten (10) days of the end of each month, deliver to Lender an aging of its Accounts and report of its inventory, and an aging of its accounts payable in such form as may be reasonably acceptable to Lender, and within thirty (30) days of the end of each month, a duly completed accounts receivable reconciliation report in such form as may be reasonably acceptable to Lender.

(j)     Borrower will continue to hold all necessary licenses and permits for the operations of their business, including but not limited to contract vendor registrations and account numbers.

(k)     Lender (by any of its officers, employees and agents) shall have the right, at any time or times during Borrower's usual business hours (provided reasonable prior notice is given except if an Event of Default has occurred and is continuing), to inspect the Collateral, all records related thereto (and to make extracts from such records) and the premises upon which any of the Collateral is located, to discuss Borrower's affairs and finances with any person and to verify the amount, quality, quantity, value and condition of, or any other matter relating to, the Collateral.

(l)     (A)     Lender shall have the right at any time and from time to time, without notice, to notify Account Debtors to make payments to Lender, to endorse all items of payment which may come into its hands payable to Borrower, to take control of any cash or non-cash proceeds of Accounts and of any returned or repossessed goods; to compromise, extend or renew any Account or deal with it as it may deem advisable, and to make exchanges, substitutions or surrenders of Collateral, to notify the postal authorities, after an Event of Default, to deliver all mail, correspondence or parcels addressed to Borrower to Lender at such address as Lender may choose.  (B) Borrower herewith appoints Lender or its designee as Attorney-in-Fact to endorse Borrower's name on any checks, notes, acceptances, drafts or any other instrument or document requiring said endorsement and to sign Borrower's name on any invoice or bills of lading relating to any Account, or drafts against its customers, or schedules or confirmatory assignment on Accounts, or notices of assignment, financing statements under the Uniform Commercial Code, and other public records, and in verification of Accounts and in notices to Account Debtors.  (C) Lender shall have no obligation to preserve any rights against any Person obligated on any Account, chattel paper, instrument or other item of Collateral.  Lender shall not be permitted to exercise the rights granted to it under the foregoing clauses (A) and (B) prior to an Event of Default.

(m)     Borrower will furnish Lender with at least ten (10) days' prior written notice of any change in location of or addition to its chief executive office, the office where it keeps its records concerning its Accounts, its location of Inventory, Equipment and other assets, and other business locations.

(n)     Pay and discharge, and require its subsidiaries to pay and discharge, when due, all taxes, assessments or other governmental charges imposed on them or any of their respective properties, unless the same are currently being contested in good faith by appropriate proceedings and adequate reserves are maintained therefor.

(o)     Operate its properties, and cause those of its subsidiaries to be operated in compliance with all applicable orders, rules and regulations promulgated by the jurisdictions and agencies thereof where such properties are located and duly file or

cause to be filed such reports and/or information returns as may be required or appropriate under applicable orders, regulations or law.

(p)     Permit the Lender's representatives and/or agents full and complete access to any or all of the Borrower's and its subsidiaries' properties and financial records, to make extracts from and/or audit such records and to examine and discuss the Borrower's properties, business, finances and affairs with the Borrower's officers and outside accountants.

(q)     Obtain lien releases and lien waivers, in a statutory standard form, as and when Borrower pays contractors, materialmen, laborers providing labor, equipment, or materials to the Mortgaged Property and submit copies of the same to Lender.

9.     **Negative Covenants of Borrower.**  To induce Lender to make the Loan pursuant to this Agreement, Borrower hereby covenants and agrees that so long as the Loan shall remain outstanding, Borrower shall not:

(a)     Except for Permitted Encumbrances as set forth on Schedule C attached hereto and made a part hereof, at any time: (i) create, incur, assume or suffer to exist any mortgage, deed of trust, pledge, security interest, encumbrance, lien or charge of any nature upon or with respect to Borrower's assets and properties or (ii) sign or file under the Uniform Commercial Code of any jurisdiction a financing statement which names Borrower as a debtor or (iii) sign any security agreement authorizing any secured party thereunder to file such financing statement.  Borrower further covenants and agrees not to grant any similar negative pledge to any other lender.

(b)     Except as to the sale or disposition of assets which are obsolete or worn out and are no longer used or useful in the conduct of its business, convey, sell, lease, assign, transfer, hypothecate or otherwise dispose of any of its now or hereafter acquired property, business or assets.

(c)     Create, incur, suffer to exist, assume, guaranty, endorse, become a surety, or otherwise become liable for the debt or other obligations of any other Person whether directly or indirectly, or make or incur any advance, purchase commitment, other obligation or loan for the direct or indirect purpose of paying or discharging any such obligations.

(d)     Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment income, any Person.

(e)     Enter into any merger or consolidation or liquidate or wind-up or dissolve itself (or suffer any liquidation or dissolution) or convey, sell, lease, assign, transfer or otherwise dispose (directly or indirectly) of all or substantially all of its

property, business or assets or make any material change in its present method of conducting business or permit any corporate guarantor to do any of the foregoing.

(f)     Materially change, amend, alter or modify the bylaws/operating agreement or other governing documents of Borrower or permit any corporate guarantor to do any of the foregoing.

(g)     Enter into or permit any Guarantor to enter into any transaction, including, without limitation, the purchase, sale or exchange of property or the rendering of any service, with any officer, director, shareholder or partner of Borrower or any Guarantor or Affiliate of any of the foregoing.

(h)     Declare or pay any dividends on, distributions on or make any payment on account of, or set apart assets or a sinking fund for the purchase, redemption, defeasance, retirement or other acquisition of, any interest, shares or any class of stock or any warrant or option to purchase any such stock whether now or hereafter outstanding or make any other distribution in respect thereof, directly or indirectly whether in cash or property or obligations.

(i)     Create, incur, suffer to exist any indebtedness, except (i) indebtedness in respect of the Loan; and (ii) indebtedness, if any, outstanding as of the date of this Agreement and shown on the financial statements previously delivered to Lender.

(j)     Transfer, sell, lease or otherwise convey (directly or indirectly) any interest or shares of capital stock or membership or ownership interest in Borrower and/or any guarantor.

(k)     Purchase any Inventory or Equipment except in the ordinary course of business from persons customarily in the business of selling such Inventory or Equipment.

(l)     Without prior written consent of Lender, remove the Collateral from its present location, except for the removal of Inventory upon its sale.

(m)     Sell or transfer any Inventory to any Affiliate or subsidiary of Borrower except on arms length terms in the ordinary course of business.

(n)     Sell, lease or transfer any of its equipment (except for abandoned or obsolete equipment) or other assets without the prior written consent of Lender except for sales of inventory in the ordinary course of business to good faith purchasers for value.

(o)     Allow its existence of as a corporation/limited liability company to be other than in good standing and will not, without the prior written consent of Lender,

dissolve or liquidate, or merge or consolidate with or acquire or affiliate with any other business entity or form any subsidiary.

(p)    Change its name without furnishing to Lender at least ten (10) days' prior written notice thereof.

(q)    Utilize any trade name, and will not in the future utilize any trade name without furnishing to Lender at least ten (10) days prior written notice thereof.

(r)    Change the nature of its business.

(s)    Sell, assign, transfer or dispose of any of its accounts or notes receivable, with or without recourse, except to the Lender.

(t)    Except after notice to Lender and with Lender's prior written consent, partition or subdivide the Mortgaged Property.

10.    **Events of Default.** The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)    failure of Borrower to make any payment of any installment of principal or interest when due under the Note;

(b)    failure of Borrower to pay any other sum when due hereunder or under the Note or any other Loan Document;

(c)    any representation or warranty of Borrower or the Guarantor made herein or in any other Loan Document or in any other writing given to Lender in connection with the Loan shall have been incorrect in any material respect as of the time when the same shall have been made or is nor accurate when a further disbursement is to be made to Borrower;

(d)    the occurrence of an Event of Default under the Mortgage or any other Loan Document;

(e)    the sale, conveyance, assignment, transfer or other disposition or divestiture of Borrower's title to any of the Collateral, or the mortgage or other conveyance of a security interest in, or other encumbrance on any of the Collateral or any interest therein, whether voluntary or involuntary, except as provided herein;

(f)    any merger, consolidation, liquidation or dissolution, or the sale or transfer of all or substantially all of the assets, of the Borrower;

(g)    the transfer (directly or indirectly) of any of the stock or other ownership interest of Borrower;

(h)     any default in the performance or observance of any term, covenant or agreement to be performed by Borrower or Guarantor in this Loan Agreement or in any Loan Document;

(i)     the use of proceeds of the Loan for any purpose other than the purpose described in Paragraph 6(n);

(j)     any Loan Documents for any reason shall cease to be in full force and effect, the liens on the Collateral purported to be created thereby shall cease to be or are not valid and perfected liens having priority over all other liens except any encumbrances specifically permitted under such Loan Documents, or any Guarantor shall assert that it has no liability under the Guaranty to which it is a party;

(k)     one or more judgments or decrees shall be entered against Borrower or any Guarantor (not paid or fully covered by insurance) and all such judgments or decrees shall not have been vacated or discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(l)     if Borrower or any Guarantor becomes insolvent;

(m)     if Borrower or any Guarantor generally does not pay its debts as they become due and Borrower has failed to make any payment to Lender required by the Loan Documents;

(n)     if Borrower or any Guarantor makes an assignment for the benefit of creditors;

(o)     if Borrower or any Guarantor calls or causes to be called a meeting of creditors for the composition of debts;

(p)     if there shall be filed by or with the consent or authorization of Borrower or any Guarantor a petition in bankruptcy for liquidation or for reorganization, or a custodian, receiver or agent is appointed or authorized to take charge of its properties, or Borrower or any Guarantor authorizes any such action;

(q)     if there shall be filed against Borrower or any Guarantor a petition in bankruptcy, for liquidation, or for reorganization, or a custodian, receiver, or agent is appointed or authorized to take charge of its properties and Borrower or any Guarantor, as the case may be, has not consented to or authorized such action and such action is not dismissed within sixty (60) days; and

(r)     if any license, permit, registration, vendor account or other approval required for the normal operation of Borrower's business or any of the Collateral shall be suspended or shall cease to be in full force and effect.

11.   **Remedies.**

(a)   Upon the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, in addition to any remedies available to Lender under applicable law, Lender may take one or more of the following remedial steps in any order of priority:

(i)   Declare immediately due and payable the outstanding principal balance of the Note, together with all accrued and unpaid interest, fees and other sums or expenses payable thereunder and hereunder and accordingly accelerate payment thereof without presentment, demand, notice of intention to accelerate, notice of acceleration or notice of any other kind, all of which are expressly waived;

(ii)   Take any action at law or in equity against Borrower or the Guarantor (a) to collect the payments then due and thereafter to become due under the Loan Documents, or (b) to enforce performance and observance of any obligation, agreement or covenant of Borrower or such other parties under the Loan Documents;

(iii)   Exercise any and all rights and remedies provided for in the other Loan Documents as they relate to Borrower or any Guarantor.

(iv)   Proceed with or without judicial process to take possession of all or any part of the Collateral provided for herein not already in the possession of Lender and Borrower agrees that upon receipt of notice of Lender's intention to take possession of all or any part of said Collateral, Borrower will do everything reasonably necessary to assemble the Collateral and make same available to Lender at a place to be designated by Lender.  Borrower hereby waives any and all rights it may have, by statute, constitution or otherwise to notice from Lender, for Lender to obtain possession, by Court proceedings or otherwise, of the Collateral provided for in this or in any other agreement with Lender;

(v)   So long as Lender acts in a commercially reasonable manner, assign, transfer and deliver at any time or from time to time the whole or any portion of the Collateral or any rights or interest therein in accordance with the Uniform Commercial Code, and without limiting the scope of Lender's rights thereunder, Lender may sell the Collateral at public or private sale, or in any other manner, at such price or prices as Lender may deem best, and either for cash or credit, or for future delivery, at the option of Lender, in bulk or in parcels and with or without having the Collateral at the sale or other disposition.  Lender shall have the right to be the purchaser at any public sale.  Lender shall have the right to conduct such sales on Borrower's premises or elsewhere and shall have the right to use Borrower's premises without charge for such sales for such time or times as Lender may see fit.  Lender is hereby granted license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property

of a similar nature, as it pertains to the collateral, in advertising for sale and selling any collateral and Borrower's rights under all licenses and franchise agreements shall inure to Lender's benefit. Borrower agrees that a reasonable means of disposition of Accounts shall be for Lender to hold and liquidate any and all Accounts.  In the event of a sale of the Collateral, or any other disposition thereof, Lender shall apply all proceeds first to all costs and expenses of disposition, including reasonable attorneys' fees, and then to the Obligations of Borrower to Lender;

(vi)    Elect to retain the Collateral or any part thereof in satisfaction of all Obligations due from Borrower to Lender upon notice of such proposed election to Borrower and any other party as may be required by the Uniform Commercial Code; and

(vii)   Lender shall have the right immediately, and without notice or other action to set-off against any of any Borrower's Obligations to Lender any sum owed by Lender in any capacity to any Borrower whether due or not, and Lender shall be deemed to have exercised such right of set-off and to have made a charge against any such sum immediately upon the occurrence of a Default, even though the actual book entries may be made at some time subsequent thereto.

(b)    No remedy conferred in this Agreement or the other Loan Documents is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law or equity or by statute or otherwise.

12.    **Payment of Expenses.**

(a)    Borrower agrees that it shall pay, within five (5) days after demand, all out-of-pocket expenses incurred by Lender in connection with this transaction including, without limitation, fees and expenses for any title searches required hereunder, recording and filing fees, and reasonable attorneys' fees incurred by Lender in connection with the Loan (including any amendments and waivers), the preparation of the Loan Documents, the administration of the Loan, inspection of the Mortgaged Property during the course of the Project and the enforcement Lender's rights and remedies under the Loan Documents.

(b)    If Borrower should fail to perform or observe, or to cause to be performed or observed, any covenant or obligation under this Agreement or any of the other Loan Documents, then the Lender, may (but shall be under no obligation to) take such steps as are necessary to remedy any such nonperformance or nonobservance and provide for payment thereof, if any (which shall include, without limitation, steps necessary to cure any defaults of Borrower under any lease).

(c)    All amounts expended or advanced by the Lender pursuant to this Paragraph 12 shall become part of the outstanding principal balance of the Loan and the

Note, shall be secured by, among other things, the Mortgage, shall become due and payable by the Borrower upon demand by Lender, and shall bear interest at the Default Rate (such interest to be calculated from the date of such advance by Lender to the date of repayment thereof by Borrower).

13.  **Lender's Right to Assign.**  Lender shall have the right to sell, assign, transfer or dispose of all or any part of its interest in the Loan without the consent or approval of Borrower or Guarantor.

14.  **Default Interest Rate.**  All sums advanced and all expenses incurred by Lender pursuant to any provision of this Agreement or of the other Loan Documents which are not paid when due shall bear interest at the Default Rate set forth in the Note from the date such sum was due until such sum is paid in full and shall be secured by the Mortgage.

15.  **Usury Savings.**  Notwithstanding anything to the contrary contained herein, under no circumstances shall the aggregate amount paid or agreed to be paid hereunder or under the Note exceed the highest lawful rate permitted under applicable usury law (the "Maximum Rate") and the payment obligations of Borrower under this Agreement and the Note are hereby limited accordingly.  If under any circumstances, whether by reason of advancement or acceleration of the maturity of the unpaid principal balance hereof or otherwise, the aggregate amounts paid hereunder or under the Note shall include amounts which by law are deemed interest and which would exceed the Maximum Rate, Borrower stipulates that payment and collection of such excess amounts shall have been and will be deemed to have been the result of a mistake on the part of both Borrower and Lender or the holder of the Note, and the party receiving such excess payments shall promptly credit such excess (only to the extent such payments are in excess of the Maximum Rate) against the unpaid principal balance hereof and any portion of such excess payments not capable of being so credited shall be refunded to Borrower.

16.  **Notices.**  Any notices or other communications to be delivered to either party shall be delivered by (a) certified mail, return receipt requested, postage prepaid, (b) nationally recognized overnight courier against receipt therefor or (c) fax, with a copy simultaneously delivered to the attorney for such party, addressed to the parties at their address first set forth above and to their attorneys as follows:

Borrower's Fax No.: (616) 825-6061

Lender's Fax No.:    (201) 712-0062

Borrower's Attorney:

Law Offices of Michael X. Hidalgo
2525 East Paris Rd SE
Suite 100
Grand Rapids, Michigan 49546
Attn: Michael Hidalgo, Esq.

Lender's Attorney:

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, New Jersey 07095
Attention: Vincent P. Maltese, Esq.
Fax No.: (732) 726-6509

Any party may change its address for notices by delivering notice thereof to the other party hereunder. Notices shall be deemed delivered (a) two (2) days after mailing as aforesaid, (b) on the date shown on the courier's receipt or (c) on the date when faxed as shown on the log of the transmitting machines.

17.    **No Waiver**. No course of dealing between Borrower and Lender or any failure or delay on the part of Lender in exercising any rights or remedies hereunder shall operate as a waiver of any rights or remedies of Lender and no single or partial exercise of any rights or remedies hereunder shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder. In the event any agreement contained in this Agreement or the other Loan Documents should be breached and thereafter waived by Lender, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder or thereunder.

18.    **Failure to Exercise Rights**. Nothing herein contained shall impose upon Lender any obligation to enforce any terms, covenants or conditions contained in this Agreement and the other Loan Documents. Failure of Lender, in any one or more instances, to insist upon strict performance of any terms, covenants or conditions of this Agreement and the other Loan Documents, shall not be considered or taken as a waiver or relinquishment by Lender of its right to insist upon and to enforce in the future, by injunction or other appropriate legal or equitable remedy, strict compliance with all the terms, covenants and conditions of this Agreement and the other Loan Documents. The consent of Lender to any act or omission by Borrower shall not be construed to be a consent to any other or subsequent act or omission or a waiver of the requirement for Lender's consent to be obtained in any future or other instance.

19.   **Prohibition Against Exercise of Rights Applicable Only to Individual Lenders.** Borrower is hereby prohibited from exercising against Lender any right or remedy which it might otherwise be entitled to exercise against any one or more (but less than all) of the individual parties constituting Lender, including, without limitation, any right of set-off or any defense.

20.   **Miscellaneous.**

(a)   **Choice of Law.** THE LOAN WAS NEGOTIATED IN THE STATE OF NEW JERSEY, THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW JERSEY, WAS EXECUTED AND DELIVERED BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW JERSEY, AND THE PROCEEDS OF THE NOTE WERE DISBURSED FROM THE STATE OF NEW JERSEY, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE OF MICHIGAN, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW JERSEY SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER.

(b)   **Jurisdiction.** AT LENDER'S ELECTION, TO BE ENTERED IN ITS SOLE DISCRETION, ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER OR LENDER ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW JERSEY, AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT

INCORP SERVICES, INC., HAVING AN ADDRESS AT 3155 EAST PATRICK LANE, SUITE 1, LAS VEGAS, NV 89120, AS ITS AUTHORIZED AGENT TO RECEIVE AND FORWARD ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW JERSEY, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED IN THE MORTGAGE, SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW JERSEY. BORROWER SHALL GIVE PROMPT NOTICE TO THE LENDER OF ANY CHANGE IN ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW JERSEY (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (3) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW JERSEY OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(c)     Borrower and/or Guarantor (as applicable) agrees if Borrower and/or Guarantor is required to make any deduction or withholding of foreign taxes (or taxes imposed because Borrower and/or Guarantor is a foreign person or entity) from any payment due to Lender herein, then the amount payable to Lender upon which such deduction or withholding is based, shall be increased to the extent necessary to ensure that, after all deductions or withholdings, Lender is paid a net amount equal to the amount Lender would have been paid in the absence of such deduction or withholding. At Lender's request, Borrower and/or Guarantor shall provide Lender with documentation adequate to demonstrate payment of such deduction or withholding by Borrower and/or Guarantor under this provision.

(d)     No modification or waiver of any provision of the Note or of this Agreement and no consent by Lender to any departure therefrom by the Borrower shall be effective unless such modification or waiver shall be in writing and signed by a duly authorized officer of Lender, and the same shall then be effective only for the period and on the conditions provided therein.

(e)     Any condition of this Agreement or any other Loan Document which requires the submission of evidence of the existence or non-existence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts, and Lender shall, at all times, be free independently to establish to its reasonable satisfaction and in its absolute discretion such existence or non-existence.

(f)     Borrower and each Guarantor, as the case may be, shall execute and deliver, or cause to be executed and delivered to Lender, all other instruments, certificates and agreements as Lender or Lender's counsel may reasonably require, including, but not limited to, estoppel certificates stating that the Loan is in full force and effect and that there are no defenses or offsets thereto, to effect, confirm or assure the rights, remedies and liens intended to be granted or conveyed to Lender under this Agreement or any other Loan Document.

(g)     A determination that any portion of this Agreement or any of the Loan Documents is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provisions of this Agreement or any Loan Document to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provisions it may apply to other persons or circumstances.

21.     **Successors and Assigns.**

(a)     Borrower may not assign its rights under this Agreement without the prior written consent of Lender.  Any such attempted assignment in violation of this Agreement shall be void and of no effect.

(b)     All covenants and agreements in this Agreement shall bind and inure to the benefit of the respective permitted successors and assigns of the parties hereto and any holder or holders of the Note or any portion thereof.

22.     **Waiver of Jury Trial.  BORROWER AND LENDER AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY BORROWER OR LENDER ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE DEALINGS OF THE PARTIES WITH RESPECT HERETO OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY.  BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING.  FURTHER, BORROWER WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  BORROWER ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND THAT LENDER WOULD NOT EXTEND CREDIT TO BORROWER (AS APPLICABLE) IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS AGREEMENT.**

23.   **Releases of Collateral.**

(a)   The Lender may release, regardless of consideration, the obligation of any Person or Persons liable for payment of any of the Obligations secured hereby, or may release any part of the Mortgaged Property or any other collateral now or hereafter given to secure the payment of the Obligations or any part thereof, without impairing, reducing or affecting the obligations of the Borrower or Guarantors under the Loan Documents.

(b)   Within thirty (30) days of Borrower's request, provided: (i) Borrower is not in default hereunder or under any other Loan Document(s); and (ii) no event has occurred which with the passage of time and/or the giving of notice would constitute a default hereunder or under any other Loan Document(s), Lender shall release portions of the Mortgaged Property from the lien created by this Mortgage ("Released Property") subject to: (i) Borrower's payment to Lender of the Release Price (as hereinafter defined) for the Released Property and (ii) Borrower's delivery to Lender of documentation evidencing an arms length transaction for the sale of the Released Property. The Release Price for the Released Property shall be equal to the greater of: (i) eighty percent (80%) of the net sale price of the Released Property (subject to reasonable and customary closing adjustments and sales commissions [to be approved by Lender in Lender's reasonable discretion]); (ii) seventy-five (75%) of the gross sale price of the Released Property; and (iii) the minimum Release Price acceptable to Lender in its sole discretion.

24.   **Publicity.**

(a)   Lender shall have the right to issue news releases, and publicize and/or advertise the fact that it has provided financing with respect to the project and/or the Mortgaged Property and in connection therewith Lender shall have the right to photograph and use pictures of the Mortgaged Property in any such advertisements, brochures, print, media and other copy.

(b)   At Lender's request, Borrower, at Lender's cost and expense, shall erect a suitable sign or signs at the Mortgaged Property in a location which is clearly visible to the public and otherwise reasonably acceptable to Lender. The Sign shall be prepared by Lender and may contain, among other things, that financing for the Mortgaged Property is being provided by Lender and otherwise publicize Lender's role in the financing. Lender shall coordinate the placement and maintenance of such signs on the Mortgaged Property with Borrower.

25.   **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature

page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages.

**IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the day and year first set forth above.

WITNESS:

LENDER:

KSI CAPITAL CORP.

By: _____
Print Name: *DAVID HASKELL*

Hanan Haskell,   President

WITNESS:

BORROWER:
**NORTHEAST COMMERCIAL SERVICES CORPORATION,**
a New York corporation

By: _____
Print Name: Joanne Wandling

Ricardo C. Pagan, President

page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages.

     **IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the day and year first set forth above.

WITNESS:

**LENDER:**

**KSI CAPITAL CORP.**

By:_____

Print Name:_____

     Hanan Haskell,  President

WITNESS:

**BORROWER:**
**NORTHEAST COMMERCIAL**
**SERVICES CORPORATION,**
a New York corporation

Print Name:_____

By:_____

     Ricardo C. Pagan, President

STATE OF NEW JERSEY)
                     ) ss.:
COUNTY OF BERGEN   )

     I certify that on July __, 2006, Hanan Haskell personally came before me, a notary public of the State of New Jersey, and this person acknowledged under oath, to my satisfaction, that he:

            executed the attached Loan and Security Agreement; and

            was authorized to and did execute the attached Loan and Security Agreement on behalf of and as President of KSI Capital Funding, Inc., the entity named in this instrument, by virtue of authority granted by its bylaws and board of directors.

                                 _____
                                   NOTARY PUBLIC
                                   STATE OF NEW JERSEY

STATE OF NEW JERSEY      )
                           ): ss.:
COUNTY OF MIDDLESEX    )

     I certify that on July 21, 2006, Ricardo C. Pagan came before me, a notary public of the State of New Jersey, in person and stated to my satisfaction that:

            this person, signed and delivered the attached document as President of Northeast Commercial Services Corporation, a New York corporation and the corporation named in this document;

            this document was signed and made by the corporation as its voluntary act and deed by virtue of authority from its Board of Directors.

                                _____
                                NOTARY PUBLIC
                                STATE OF NEW JERSEY
                                My Commission Expires 5/19/10

                                   JOANNE WANDLING
                             A Notary Public of New Jersey
                             My Commission Expires ˙

## SCHEDULE A

### DESCRIPTION OF THE COLLATERAL

SCHEDULE "A"

The land referred to in this Commitment is situated in the **City of Detroit, County of Wayne,** State of Michigan, and described as follows:

Parcel 1:
Lot 10 and the West 5 feet of vacated Washington Boulevard, Plat of Section 10 of Governor & Judges Plan, according to the plat thereof as recorded in Liber 34, Page 553 of Deeds, Wayne County Records.

Parcel 2:
Lots 7, 8 and 9 and North 38.77 feet of the East 10 feet of vacated alley in the rear of Lot 7 and West 5 feet of vacated Washington Boulevard, Plat of Section 10 of Governor & Judges Plan, according to the plat thereof as recorded in Liber 34, Page 553 of Deeds, Wayne County Records.

## SCHEDULE B

### PRINCIPAL LOAN DOCUMENTS

1.   Loan and Security Agreement dated as of the date hereof;

2.   Promissory Note dated as of the date hereof;

3.   Mortgage and Security Agreement dated as of the date hereof;

4.   Document Re-Execution Agreement dated as of the date hereof;

5.   Environmental Indemnity Agreement dated as of the date hereof;

6.   Assignment of Leases and Rents dated as of the date hereof;

7.   Assignment of Licenses, Contracts, Plans, Specifications, Surveys, Drawings and Reports dated as of the date hereof;

8.   Guaranty dated as of the date hereof;

9.   Loan Closing Statement dated as of the date hereof;

10.  UCC-1 Financing Statements.

## SCHEDULE C

## PERMITTED ENCUMBRANCES

Those facts disclosed in the Mortgagee Insurance Policy No.: G47-3430748 about to be issued to KSI Capital Corp. by Lawyers Title Insurance Corporation as follows:

1.  Terms and conditions of Board of Zoning Appeals Decision and Order dated September 26, 1995 and recorded in Liber 28326, Page 554, Wayne County Records.

2.  Terms and conditions of Board of Zoning Appeals Decision and Order dated October 8, 2001 and recorded in Liber 35664, page 1148, Wayne County Records.

3.  Terms and conditions of Resolution by the Common Council of the City of Detroit designating subject property as lying within the Washington Boulevard Historic District as recorded in Liber 39993, page 110, Wayne County Records.

4.  Rights, title and interests of the other owners of portions of the building partly located on the insured land and partly located on other land in the party walls, roof, chimneys, fixtures, and other appurtenances to the building susceptible to common use, whether or not they are located in whole or in part on the insured land or other land.

## SCHEDULE D

### LENDERS

HAREL PENSION FUND MANAGEMENT COMPANY, LTD.

HAREL INSURANCE COMPANY, LTD.

)                                    )

## PROMISSORY NOTE

$4,000,000.00                                          July 21, 2006

    FOR VALUE RECEIVED, the undersigned, **NORTHEAST COMMERCIAL SERVICES CORPORATION,** a New York Corporation, (transacting business in the State of Michigan under the name of Northeast Business Realty Services, Inc.), having an office at 77 Woodbine Street, Brooklyn, New York 11221 (the "Borrower"), promises to pay to the order of **KSI CAPITAL CORP.** with an office at 17 Arcadian Avenue, Suite 106, Paramus, New Jersey 07652, ("KSI"), as lender and as agent for the lenders identified on Schedule A attached hereto and incorporated herein by reference, in each case having an address care of KSI Capital Corp., 17 Arcadian Avenue, Suite 106, Paramus, New Jersey 07652 (KSI and the lenders identified on Schedule A are hereinafter collectively referred to as "Lender") the principal sum of **FOUR MILLION and 00/100 ($4,000,000) DOLLARS,** or so much thereof as may be advanced by Lender to Borrower from time to time (the "Principal Amount"), together with interest on the unpaid Principal Amount thereof computed from the date advanced (the "Commencement Date"), at the rates provided herein until August 1, 2009 (the "Maturity Date"); provided, however, that from and after (i) the Maturity Date, whether upon stated maturity, acceleration or otherwise, or (ii) the date on which the interest rate hereunder is increased to the Default Rate (as hereinafter defined) as provided herein, such additional interest shall be computed at the Default Rate.

    As used herein, the term "Default Rate" shall mean a rate of interest of twenty-five percent (25.0%) per annum, but in no event shall the Default Rate be in excess of the Maximum Rate (as hereinafter defined).

    If any payment of interest is not paid on or before the due date for such payment, a late charge equal to the lesser of ten percent (10%) of such overdue payment or the maximum amount permitted by applicable law shall automatically become due to the holder of this promissory note (the "Note"), subject, however, to the limitation that late charges may be assessed only once on each overdue payment. Said late charges do not constitute interest and shall constitute compensation to the holder of this Note for collection and co-lender administration costs incurred hereunder. In addition, if any payment of principal or interest is not paid when due, the holder of this Note shall have the right, upon notice to Borrower, to increase the rate of interest per annum on all amounts outstanding to the Default Rate and, upon said notice, such rate increase shall be effective retroactively as of the date from which the interest component of such overdue payment began to accrue and shall remain in force and effect for so long as such default shall continue. This paragraph shall not be construed as an agreement or privilege to extend the due date of any payment, nor as a waiver of any other right or remedy accruing to the holder of this Note by reason of any default.